Good afternoon, may it please the Court, my name is David Strauss and I represent the appellant Mr. Wilkins. On June 13th of 2007, Mr. Wilkins was standing behind the locked door of his cell at Lanesboro Correctional Institution in the most secure part of that facility when the defendant, Officer Gaddy, was roughly escorting another prisoner, Timothy Kellum, back to his cell. Mr. Gaddy was bending the hands of Mr. Kellum up while they were in handcuffs, causing Mr. Gaddy was also yelling insults and curses at other prisoners on the block. Mr. Wilkins, observing this behavior, wanted to put an end to that type of behavior from correctional officers and asked to have a grievance, which is the remedy that the PLRA gives for minor violations of constitutional rights, to put the prison on notice that there's a problem. When he asked for that grievance, Mr. Gaddy, Officer Gaddy, went to Mr. Wilkins' cell and instead of giving him a grievance, Officer Gaddy threatened Mr. Wilkins and told him that if he persisted in asking for a grievance, that he was going to come into Mr. Wilkins' cell and do physical harm to Mr. Wilkins. Mr. Wilkins persisted in asking for the grievance and Officer Gaddy radioed to the control booth, had Mr. Wilkins' door open, and then Officer Gaddy, who is substantially larger than Mr. Wilkins, rushed into Mr. Wilkins' cell, picked Mr. Wilkins up, slammed him headfirst onto the concrete floor where he then got on top of Mr. Wilkins and began to pummel Mr. Wilkins until another correctional officer rushed up a flight of stairs to pull Officer Gaddy off of Mr. Wilkins. On July 24th of 2012, a jury returned a verdict in favor of Mr. Wilkins, finding that he had been maliciously and sadistically assaulted in violation of his Eighth Amendment rights. How long was the jury trial? The jury trial was two days, Your Honor. And so your client testified and the officer testified, and who else testified? There were a former correctional officer that Plaintiff's Counsel was able to track down and contact and have him agree to testify. He was actually the correctional officer who opened the door to Mr. Wilkins' cell. He was ultimately fired over that incident, and he agreed to testify on Plaintiff's behalf. You confirmed your client's version of what happened? I assume the officer did not. Right, the officer did not, but the officer who we found, his name was Barker, he did confirm the story, and he also corroborated the fact that Officer Gaddy had a reputation for having problems with prisoners. Your client suffered not much physical, not, I'm sure it was painful and bruises and everything, but there wasn't much documented medical injury, is that correct? Well, the plaintiffs contend that there was. Unfortunately, at trial, we were unable to admit most of that evidence. Plaintiff's Counsel was unable to secure a medical expert for a variety of reasons, and they attempted, we attempted to have that evidence admitted through Mr. Wilkins, but the judge, in his discretion, decided that Mr. Wilkins didn't have the expertise to testify about his medical records. There weren't prison records, you know, when somebody breaks an arm, for example, there are prison records. I mean, there were some medical records, but yes, I mean, the actual physical injuries he suffered were somewhat limited. I mean, he maintained that he had a bruised heel, that it made it difficult for him to walk for some time, that he suffered a concussion, and that he continued to have problems with his vision and headaches persisting up until the date of the trial. Okay, so then you got a jury trial for your man, and there were small damages? Yes, Your Honor, unfortunately, the jury only awarded Mr. Wilkins nominal damages, however, Plaintiff's Counsel feels like that was still a substantial victory under Farrar, because this was an issue of first impression in the Fourth Circuit. In fact, this Court had denied Mr. Wilkins' appeal, and Mr. Wilkins was successful in petitioning the Supreme Court, and the Supreme Court remanded this case, holding that a de minimis injury could still maintain an Eighth Amendment claim. Which reversed a whole bunch of Fourth Circuit cases. Yes, Your Honor, and the reason that we feel that that's so important is because Mr. Wilkins was attempting to protect his Eighth Amendment rights, which, you know, that's a foundational constitutional principle, and without the ability to sue, to allege an Eighth Amendment violation, and put prisons on notice that officers can't simply assault prisoners and hope that they don't do lasting damage to them, this case was important for that reason, because it sends a message to officers that they have to . . . Are the facts of this case important? I thought we had before us a broad constitutional challenge to the constitutionality of the cap in general. Well, I think the context in which this case occurred is important. The fact that it was an issue of first impression, I think the facts just help to illuminate that this wasn't some lawsuit about a catch-up packet. I mean, Mr. Wilkins . . . But you didn't get, or you didn't ask for any injunctive relief, right? No. We did ask for declaratory relief, but in this particular instance, we did not ask for injunctive relief. Because the cap wouldn't apply, of course, if you'd gotten any declaratory injunctive relief. Well, the very nature of these use-of-force suits often prevents injunctive relief, because they are sort of one-off type cases that don't necessarily lead to some sort of policy change or broad injunctive relief, and also the PLRA, one of the other things that it did was to place substantial hurdles in the way of granting injunctive relief. What is unconstitutional about Congress indicating how public funds are to be spent? Well, I think what's unconstitutional about this is that in authorizing attorney's fees under Section 1988, Congress can't then take prisoners as a subset of those 1988 litigants and tell them that they are not entitled to the same determination of their attorney's fees in a 1983 lawsuit that every other civil rights litigant is. Well, but this is a rational basis test, because prisoners are not a suspect class for purposes of due process, Fifth Amendment due process, or equal protection. Yes, and that is true, and we do concede that this is a rational basis test. You concede it's a rational basis test? Yes, Your Honor, and we are aware— What is irrational about what Congress did? Well, what's irrational is when you consider the context in which the fee cap operates, the fee cap only operates when a plaintiff would be entitled to his attorney's fees under Section 1988, and by definition, under Section 1988, a 1983 litigant is not entitled to his fees unless he's been meritorious and he's filed a claim that's not merely technical or de minimis, and in this instance, although there were only nominal damages, as Justice O'Connor has pointed out, nominal damages— Doesn't Section 1988 establish in Congress a fairly broad authority over the allocation of attorney's fees in federal civil litigation or in state civil litigation with the state? In a 1983 case, a locality is going to be the most likely defendant, and doesn't Congress have a rather broad authority with respect to attorney's fees in civil suits? If this were a criminal matter, it might be different, but this is civil litigation? Well, with respect to the fact that Congress has even created a remedy under 1988, I think they have the discretion to do that, and if they find that it's a problem that attorney's suits using Section 1988 are excessive or they're harming the public, that's fine, but they then need to amend 1988 as a whole. I don't think it's fair to—or constitutional, which is the more important issue—to single out prisoners to bear the entire burden of— I don't understand the rationale for that. I understand what your position is, but I don't understand why that is so. You've just conceded that rational basis testifies, and you've also conceded, I assume, that prisoners aren't a favored class. Well, prisoners are definitely not a favored class, but they are politically unpopular and politically powerless, and they don't have any voice to defend themselves. They didn't have any voice in the passage of the PLRA. I think there were a number of circuit cases where this same claim was made that there should be an exception to the fee cap award when there's only a nominal damage award, and that every circuit has rejected that. That is true, Your Honor, but— So, you know, we've been asked to create a lot of circuit splits this morning. Yes, and although it's disfavored for a court to create a circuit split, it is within the court's authority to do so if this court finds— But it's not just one circuit. I mean, there's a variable phalanx of circuits. Well, there are six circuits that have considered this issue, and I would point out, though, that three of the circuits, it wasn't just a unanimous decision. You had the Third Circuit, which actually split on the constitutionality of the issue, and the lower court had upheld— But the holding of the circuit courts was against your position. Yes, Your Honor. Unfortunately, dissents don't count. As much as we would like them to in this case, we are aware of that, but I think that the rationale in those dissents is persuasive and compelling, and in addition to that, I think that Section 1983—excuse me, Section 1988, it permits the court to make a reasonableness determination in a 1983 lawsuit, and for Congress to say that the district courts are applying that test appropriately in every single civil rights case that comes before them, except for imprisoner cases, which are, for some reason, it's not reasonable, the only explanation for that is that Congress has an irrational animus towards prisoners, and if this statute is motivated by irrational animus— I wouldn't think that's the only basis for it. Congress may have decided that in this kind of litigation that the lodestar amount frequently exceeded the damages awarded, and that some cap was necessary, or it could have felt that the prison litigants had more time on their hands than people who were outside, and thus more opportunity to gem up in substantial litigation, or it could have thought that a cap would channel attorney efforts or prisoner efforts into cases where there was serious injury involved and away from nominal suits. I mean, just looking at it, they're not—wouldn't you say that there's not just one rational basis, but multiple rational bases? Well, I think Congress had multiple legitimate objectives, but I don't think that the fee cap is a rational way to accomplish any of those objectives. As I said earlier, Section— It'd be a rational means of—let's say Congress wanted prison litigation resources to be concentrated on cases where some measurable or serious injury was inflicted, and why wouldn't a cap in the cases of nominal damages be a rational means for Congress to channel that towards serious—cases where serious injury was inflicted? Well, I think within that question, you have to ask, in what way are they channeling it? If it's to deter the prisoner, as you said, prisoners do have incentives that other litigants don't have. They have more time on their hands, that sort of thing. But 95 percent of prison litigation occurs pro se. So to say that the unavailability of attorney's fees is going to deter the overwhelming majority of prisoners from filing a lawsuit— But you want attorneys to take the serious cases. Well, I think that Section 1988 already accomplishes that goal by making an attorney who's considering taking one of these cases measure at the outset— Well, you might, but that's a policy argument. Congress is perfectly capable of saying that 1988 by itself wouldn't accomplish that. And as I say, the danger Congress thought was that you could get a lodestar amount in these sorts of cases that vastly exceeded any kind of actual injury. And Congress thought that was a problem and wanted to address it through the cap. Isn't this kind of in line with the Farrar decision? Well, I think, I mean, that's sort of the point is that it is in line with Farrar because well, the Farrar already does what the fee cap sought to do. In other words, an attorney has to make a determination about whether— I mean, how can it be unconstitutional? Well, it's unconstitutional because it singles out one class of litigants to accomplish that goal. It could be that Congress thought that the lodestar amount was too high, but to say that the lodestar amount is too high in a prisoner case where a prisoner only wins $100, but it's not too high in a case where a citizen is assaulted by a police officer and only wins $100, and his attorney is still entitled to have a district court determine the reasonableness— It would be more interesting if prisoners had been recognized as a suspect or quasi-suspect class. But the hard part, I think, in your case is that you're under a rational basis standard of review. And for us to conclude in contrary to all the other circuits that what Congress did was irrational, that's a hard one. That's a tall, tall climb. Well, that being so, you know, we're still here pushing the court to apply a really searching form of rational basis review and to not simply rubber stamp Congress's classification and to determine whether or not the— You say that this is wrong because it creates a classification, but that's what legislation does. I mean, every enactment, every provision creates classes. There are classes that benefit and there are classes that don't. You put a 16-year-old age for getting a driver's license. You benefit people over 16. You work—legislation works to the detriment of that class of people under 16. And every single piece of legislation creates classes, a benefited class and a class that's left out of the benefit and is not benefited. And that's why we have rational basis scrutiny. And if we do something like this, we're going to start looking into everything. Well, I don't think that the court needs to worry about a slippery slope argument because although rational basis is highly deferential and the court should only invalidate— What statute should we put in place? I don't think— If we were to rule this statute unconstitutional, what statute would you draft for us? Well, I don't think that any statute is necessary, Your Honor, because Section 1988 already accomplishes those things which the fee cap seeks to do. Well, I suppose Congress doesn't feel exactly that way. Well, Your Honor, I would say that if Congress doesn't feel that way, then Congress should amend Section 1988 and— that enacted this statute to begin with. The whole supposition is that Section 1988 was not sufficient to address this particular situation. And your position is that you are going to say Section 1988 must govern. I gather you would say any cap was unconstitutional because it contravenes Section 1988. Is that correct? I would say that, Your Honor. That's what you would say? Yes. And that— so you're not only ruling this unconstitutional, you, by your position, by saying 1988 is the only constitutional harbor, you have ruled out any cap whatsoever in this whole thing. Now, Congress might not like that substitute statute that you have drafted. Well, I think— and maybe I need a bit of a clarification, but are you asking whether I would be opposed to a cap for 1988 fees that applied across the board to all prevailing 1983 litigants or just the prisoners? Because if the cap applied equally across the board to all— You know, the thing that sort of escapes your argument that I really can't emphasize enough is that prisoners are not in the same position as other people. They're just not. So there are all kinds of strictures on prisoners that don't exist on other people. And that seems to me to be really sort of a— and we have rational basis review here, which you can see, and we do. I don't know how you get by that bump. Well, I thought my time was up, but I see I still have a minute, and— Oh, I guess I'm going into my rebuttal. Maybe you can cogitate on that. Certainly, Your Honor. I'd like to reserve the rest of my time for rebuttal. You reflect on that a little bit. Thank you, Your Honor. Ms. Grand, we'd be happy to hear from you. May it please the Court, Your Honor. My name is Kimberly Grandy, and I'm with the North Carolina Department of Justice. I have with me here today Jonathan Levy from the United States Department of Justice here on behalf of the appellant, Officer Gaddy. As the Court's discussed at length with Mr. Strauss, we are here regarding a case in which a jury valued the violation of a prisoner's rights at $0.99. His attorneys have asked for over $92,000 in attorney's fees. I'd like to remind the Court that any constitutional significance to which the plaintiff's counsel attributes to this case was achieved prior to their entry or notice of appearance in this case. Mr. Strauss' legal services organization only entered a notice of appearance on behalf of Mr. Wilkins after the point of remand from the United States Supreme Court in this case. So any value that Mr. Strauss attributes to Mr. Wilkins' case was achieved on a pro se status by Mr. Wilkins himself. This demonstrates that the PLRA is operating just as it should. Would that make any difference if at trial he managed to get some sort of interlocutory or I mean some sort of injunctive relief? Wouldn't it make any difference? It may not have made any difference. That's interesting. And as your honors have pointed out to Mr. Strauss, prisoners are not entitled to a heightened standard of review here.  And the PLRA does not burden a fundamental right as this court held in Plyler v. Moore. Therefore, the PLRA and its fee cap are entitled to a presumption of validity. Is there something that we have not covered that you wish to bring to us? No, sir. I'd just like to go through and demonstrate for your honors, as you've already noted, that the PLRA satisfies the rational basis test because it seeks to reduce several legitimate governmental interests which the plaintiff's counsel concedes, which is to reduce marginal trivial lawsuits. Which of these bases did we not cover in our questions? I'd like to discuss a little further the protection of the public fisc, which is the savings that would be granted to the states in defense of these actions. And also, as your honors have discussed, to prevent windfalls to attorneys which would normalize or equalize uniform fee applications among plaintiff's counsel throughout PLRA. Wilkins concedes that all of these are legitimate governmental interests, and I would urge your honors to uphold that this is a legitimate governmental interest, which is satisfied rationally by the objectives that Congress set out. Congress gave incentives to these cases, just as Judge Wilkinson was questioning Mr. Strauss regarding the granting of the ability for 1988 plaintiffs to achieve some attorney's fees award. Congress gave that ability to 1988 litigants, and it is not constitutionally problematic that they sought to further restrict it to a particular group of individuals because there is no constitutional entitlement to attorney's fees for plaintiff's counsels. Congress created that right and then sought to further limit it by- state need not do something, but once it creates a right in somebody, it can't discriminatorily deny it. So that doesn't go all the way with you, but your claim is here, A, prisoners are different than these people, the other people which are granted this right, and B, you have asserted a bunch of reasons why you think that this difference that the Congress has made is justified. Yes, your honor, and any one of those any, as the Supreme Court stated in Heller v. Doe, any reasonable, reasonably conceivable data facts in which that legitimate government interest is served by the PLRA's fee cap restriction, of any of those four, if it is served by the fee cap restriction and it's reasonably conceivable for it to do so, then the PLRA's fee cap restriction should survive rational basis test and should be upheld by this court. Thank you. With that, I'll leave any further questions of this to Mr. Levy. Mr. Levy. Good morning, I'm Jonathan Levy with the United States Department of Justice. We have intervened in this case to defend the constitutionality of the PLRA's attorney's fee cap. I believe that the court has hit all the high points here on this issue. The other courts of appeals who have addressed this issue have raised a sort of plate before you of different rational bases on which you can affirm this, and this court has already ruled, as Judge Motz alluded, that prisoners are very different and particularly are different from non-prisoners with respect to their propensity to file certain kinds of cases in the federal courts, and that justifies or makes rational, I should say, this legislation to a number of legitimate governmental goals. Can I ask you, Mr. Levy, the Supreme Court has said that the legislature is supposed to pursue a legislative goal incrementally, right? That it may, yes, Your Honor. It said that in Dukes. Take it from me. And that sounds perfectly reasonable, right? Is there any limitation to that? Could Congress say, for example, we want to conserve public funds so no redheads can recover attorney's fees under 1983? Something I'm very interested in because I have two little redhead boyfriends and grandsons. I think that kind of legislation would If there's been some sort of study that redheads got higher fees and they thought that this would be a way to cut down, why would that be unreasonable? I think the last part that you added would make it look more reasonable. What I was going to say is if it's completely arbitrary, if it is unrelated in any way to the goal. So you think the limitation is just sort of not pure? That is correct. And repeatedly courts have said that a pure fit is not required and is often impossible. Well, a perfect fit is not required, but isn't some fit required? I think the answer is yes, some fit is required and there is a significant amount of fit here. And the reason for that has been discussed in all of the cases and was discussed in this court's roller case that prisoners have these additional incentives to file lawsuits that non-prisoners don't have. And those incentives in fact induce prisoners to file disproportionate numbers of frivolous lawsuits as well as disproportionate numbers of low value, a number of terms have been used, but I'll use low value lawsuits. And Congress could, as Judge Wilkinson alluded to earlier, believe rationally that those kinds of lawsuits can lead to disproportionate attorney's fees, even under 1988 as it is currently in place. I understand your argument here, but you would concede that there is a basis where there is a time when the fit is so imperfect that it can't even be justified on rational basis grounds. Yes, a purported fit may in fact be irrational. I think we're nowhere near that borderline limit here, but it is true. That's what rational basis test tests. It tests when a litigant says, here is the rational basis that I'm proposing. And a court might say, the fit is so bad, so far off that it's irrational. And we're just not anywhere near that limit here. I don't think any of these tests allow for arbitrary government action that's just arbitrary and capricious, whether you're talking about due process or equal protection or anything else. There does have to be some reason. That's what rational means. I think that's correct. The Constitution does provide protections against completely arbitrary government action. And what you're saying is that there's a large gap between reasonable and precise tailoring and precise fit. And that, yes, Your Honor, and that is sort of presumably why the Supreme Court has created different categories of fit that are required. It is conceded here that we are at the lowest category of fit, the rational basis category, and there are many rational bases for the  How many circuits have ruled with you on this question? I believe that the answer is that six have ruled precisely with us with respect to this precise limitation, the 150 percent limitation, and an additional two have ruled on the very closely related hourly limit limitation. Do you go around and argue all these cases? The government has not been involved in all, the federal government has not been involved in all these cases. I've been involved in a number of them. But there's six circuits that have ruled squarely with you. Yes. Yes, Your Honor. And the other two is very, very close. It's hard to distinguish those as well. If there are no further questions, thank you very much for your time, Your Honors. We thank you. Here's some rebuttal time, Mr. Strauss. As brief as possible, since we have addressed many of these issues. But in response to Judge Motz's earlier inquiry about prisoners not being a suspect class, and we have lots of classifications that treat prisoners differently, that is true. But I think what's important to remember here is that we're not discussing those other classifications, because whenever we review how a law classifies somebody and treats them, there has to be a fit between the means and the ends. So the classification and what that classification hopes to achieve. And here, when we look specifically at the fee cap, I think that the nexus is just so, so far that there is no rational relationship. The statute is super under-inclusive. Ninety-five percent of the cases that are being filed by prisoners are not touched by this fee cap provision. And so the goals of deterring frivolous litigation or trivial litigation are not affected in 95 percent of those cases. And then in the 5 percent of cases where there is counsel, and this could arguably have some put the same sort of calculus into an attorney's head. Senator Kyle, when he was making comments about the PLRA, said that they wanted to make the inducements for filing a lawsuit for a prisoner the same as those. Maybe if the cap was removed, it would be a lot higher than 5 percent. Well, actually, Your Honor, I think that's a great point, is that prior to the enactment of the PLRA, when Congress believed that there was this flood of litigation, the number of attorneys who have been involved in these prison litigation cases has not changed pre- and post-PLRA. We have the same number of attorneys taking representation in these suits. This discussion might perhaps be more appropriate for a legislative hearing? Well, I don't want this court to act as a super legislature. I don't think that's appropriate for the court. Congress might be very interested in your statistics. Well, I think that they are of interest to the court as well because they demonstrate that there is not the fit that's necessary, that the fit is so removed that this statute does violate the Equal Protection Clause, even on a rational basis. But the courts have consistently refused to require empirical proof at the rational basis level, in part because empirical studies go every which way and statistics are bandied for every conceivable proposition. And as a result, we don't require a rational basis scrutiny to be backed up by an empirical, to be empirically locked down because it's almost, it's very hard to lock any proposition down empirically. They're always subject to dispute. And I believe that you can wrangle statistics to make them say what you want, and I don't mean to say that Congress needs to have statistics to support this. I just offer those to illustrate to the court that the reality of the situation makes it irrational for Congress to believe that the fee cap would achieve what it does. And all the fee cap does do is set some arbitrary quantity of injury that a prisoner must have before he's going to be able to have counsel to represent him. And if more litigation occurs pro se, that's going to clog up the courts. And that is contrary to what Congress intended with the PLRA, and I see that I'm out of time. So thank you, Your Honor. Thank you, Mr. Strauss.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Henry F. Floyd